UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| GRANT F. SMITH, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:18-cv-2048 (TSC) |
| UNITED STATES NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (NARA), | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff Grant F. Smith, proceeding *pro se*, has sued Defendant U.S. National Archives and Records Administration ("NARA") seeking to compel responses to his two Freedom of Information Act ("FOIA") requests. Pending before the court are NARA's motion for summary judgment under Federal Rule of Civil Procedure 56, (ECF No. 10), and Smith's cross-motion for summary judgment, (ECF No. 13).

For the reasons set forth below, the court will GRANT Defendant's Motion for Summary Judgment and will DENY Plaintiff's Cross-Motion for Summary Judgment.

### I. BACKGROUND

Smith is a public interest researcher and founder of the Institute for Research: Middle Eastern Policy, Inc. (ECF No. 1. ("Compl.") ¶ 3.) On June 29, 2018, he filed a FOIA request with the George W. Bush Presidential Library ("Bush Library") and a request with the William J. Clinton Presidential Library ("Clinton Library"). (*Id.* ¶ 5.) Both presidential libraries are operated by NARA. (*Id.*) The requests seek letters from Presidents Bush and Clinton to Israel

1

regarding the Nuclear Non-Proliferation Treaty.  (*Id.* Ex. A, Ex. B.)  NARA denied both FOIA requests by issuing a *Glomar* response, neither confirming nor denying the existence of the letters.  (*Id.* Ex. C, Ex. D.)  Smith appealed the denials on July 16, 2018.  (*Id.* Ex. F, Ex G.)  Before those appeals were processed, Smith filed this suit to compel disclosure of the requested documents.  (*Id.*)

NARA moved for summary judgment on December 20, 2018, on the basis that the Bush Library response is unreviewable and the Clinton Library's *Glomar* response was proper.  (ECF No. 10-1 ("Def. Br.") at 2, 6.)  Smith cross-moved for summary judgment.  (ECF No. 13.)

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is proper where the record shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  Courts must view "the evidence in the light most favorable to the non-movant[ ] and draw[ ] all reasonable inferences accordingly," and determine whether a "reasonable jury could reach a verdict" in the non-movant's favor.  *Lopez v. Council on Am.–Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  "Where the non-moving party is proceeding *pro se*, courts in this jurisdiction will construe the non-moving party's filings liberally."  *Cunningham v. U.S. Dep't of Justice*, 40 F. Supp. 3d 71, 82 (D.D.C. 2014), *aff'd*, No. 14-5112, 2014 WL 5838164 (D.C. Cir. Oct. 21, 2014).  "However, a *pro se* litigant still has the burden of establishing more than '[t]he mere existence of a scintilla of evidence' in support of his position."  *Id.*  (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

B. **Presidential Records Act**

Congress passed the Presidential Records Act of 1978 ("PRA") in order to: (1) guarantee "public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office" and (2) "minimize outside interference with day-to-day-operations of the President and his closest advisors and ensure executive branch control over presidential records during the President's term in office." *Judicial Watch, Inc. v. Nat'l Archives and Records Admin.*, 845 F. Supp. 2d 288, 296 (D.D.C. 2012) (quoting *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991)). The PRA delegates to the Archivist of the United States "responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." 44 U.S.C. § 2203(f)(1). The Act also has several provisions governing restrictions on access to presidential records.

The PRA allows the President, before leaving office, to restrict access to certain categories of presidential records for up to twelve years. 44 U.S.C. § 2204(a). The President may restrict access to materials "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . in fact properly classified pursuant to such Executive order." 44 U.S.C. § 2204(a)(1).[1] During the period of restricted access, the Archivist's determinations regarding access to presidential

---

[1] The other categories of materials are: "(2) relating to appointments to Federal office; (3) specifically exempted from disclosure by statute (other than sections 552 and 552b of title 5, United States Code, provided that such statute (A) requires that the material be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of material to be withheld); (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential; (5) confidential communications requesting or submitting advice, between the President and the President's advisers, or between such advisers; or (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 44 U.S.C. § 2204(a)(2)–(6).

records are immune from judicial review. 44 U.S.C. § 2204(b)(3). But "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." *Armstrong v. Exec. Office of the President (Armstrong II)*, 1 F.3d 1274, 1290 (D.C. Cir. 1993).

## C. FOIA

"FOIA provides a 'statutory right of public access to documents and records' held by federal government agencies." *Citizens for Resp. and Ethics in Wash. v. U.S. Dep't of Justice*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)). FOIA requires that federal agencies comply with requests to make their records available to the public, unless such "information is exempted under [one of nine] clearly delineated statutory [exemptions]." *Id.* (quoting *Pratt*, 673 F.2d at 413) (internal quotation marks omitted); *see also* 5 U.S.C. §§ 552(a)–(b).

The district court conducts a *de novo* review of the government's decision to withhold requested documents under any of FOIA's specific statutory exemptions. *See* 5 U.S.C. § 552(a)(4)(B). The government agency bears the burden of showing that nondisclosed, requested material falls within a stated exemption. *See Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)).

In FOIA cases, including those where an agency issues a *Glomar*[2] response, summary judgment may be based solely on information provided in the agency's supporting declarations. *See Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007) ("Proper invocation of, and affidavit support for, either Exemption, standing alone, may justify the CIA's *Glomar* response."); *Am. Civ. Liberties Union (ACLU) v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) ("An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions. Typically it does so by affidavit."). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU*, 628 F.3d at 619 (citations omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). In order to overcome an agency's "showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (citing *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

---

[2] A *Glomar* response is a "response to a FOIA request, in which an agency states that it can 'neither confirm nor deny' the existence of responsive records, [named] after a case concerning a FOIA request for records relating to an underwater sea craft called the 'Glomar Explorer.'" *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 n.2 (D.C. Cir. 1995) (citing *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976)).

An agency issuing a *Glomar* response is entitled to summary judgment if it shows through affidavits or declarations that "acknowledging the mere existence of the responsive records would disclose exempt information." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). "In *Glomar* cases courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than mere conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Id.* at 332 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C.Cir.1982)). "The supporting affidavit must justify the *Glomar* response based on 'general exemption review standards established in non-*Glomar* cases.'" *Id.* (quoting *Wolf*, 473 F.3d at 374–75).

## III. ANALYSIS

### A. FOIA Request to Bush Library

NARA moves for summary judgment on Smith's FOIA request to the Bush Library for an alleged letter from President Bush to Israel regarding the Nuclear Non-Proliferation Treaty. NARA argues that its *Glomar* response is unreviewable because President Bush's presidential records are still subject to the twelve-year restricted period under the PRA. (Def. Br. at 6–7.) Smith contends first that the requested Bush letter is not properly classified, and second, that John Laster, Director of the Presidential Materials Division at NARA, is not a proper classification authority. (ECF No. 11-1 ("Pl. Br.") at 48–52.)

Pursuant to the PRA, President George W. Bush invoked the twelve-year restriction period for his presidential records falling under § 2204(a), including for properly classified documents in the interest of national defense or foreign policy. (ECF No. 10-2 ("Laster Decl.") ¶ 13; ECF No. 16-1.) That period does not expire until January 2021. (Laster Decl. ¶ 13.) During the twelve-year restricted period, the Archivist's determination to restrict access to

presidential records under § 2204(a) is not subject to judicial review, except where the President himself challenges a determination that violates his rights or privileges. 44 U.S.C. § 2204(b)(3), (e); *see also Armstrong II*, 1 F.3d at 1293 ("[D]ecisions that involve materials that are truly presidential records are immune from judicial review[.]").

While it cannot review the Archivist's determination regarding access to a restricted presidential record, the court must determine whether the material sought is a presidential record in the first instance. The PRA defines "Presidential records" as "documentary materials, or any reasonably segregable portion thereof, created or received by the President . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The document sought, a letter sent from President Bush during his presidency to a foreign state regarding foreign policy, satisfies the definition of presidential records under the PRA. Because the requested material is a presidential record and the twelve-year restriction period is still in place, the PRA precludes judicial review of the Archivist's determination restricting access to the document sought.

Smith further argues that the Director of Presidential Materials Division, John Laster, does not have proper authority to restrict access to presidential records under the PRA. (Pl. Br. at 51.) Though the basis for Smith's assertion is unclear, the court assumes that it rests on the language in the PRA repeatedly referring to "the Archivist." Section 2104(b), which governs the role of the Archivist, permits delegation of "any of the functions of the Archivist to such officers and employees of the Administration as the Archivist may designate." 44 U.S.C. § 2104(b). Pursuant to this section, NARA issued a policy directive delegating authority to administer restrictions on presidential records to the Director of the Presidential Materials Division. (ECF

No. 16-2 ("NARA Policy Directive") § 13(c).) Given the policy directive's delegation, Laster is properly authorized to impose presidential restrictions under the PRA.

Smith also argues that the court has jurisdiction to review the Bush Library's restriction on the documents withheld because he has alleged a criminal conspiracy to violate the Arms Export Control Act ("AECA"), the substance of which is discussed in detail below. (ECF No. 18 ("Pl. Opp'n") at 15–18.) The PRA does allow for special access to presidential records "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding." 44 U.S.C. § 2205(2)(A). But Smith has not proffered any issued subpoenas or investigations related to the information sought, and the court is unaware of any. Thus, § 2205(A)(2) is inapplicable.

Accordingly, the court finds that NARA is entitled to summary judgment on whether the PRA precludes judicial review of Smith's FOIA request for the letter President Bush.

### B. FOIA Request to Clinton Library

NARA moves for summary judgment on Smith's FOIA request to the Clinton Library seeking an alleged letter from President Clinton to Israel regarding the Nuclear Non-Proliferation Treaty. NARA issued a *Glomar* response and argues that the response was proper under FOIA exemption 1. (Def. Br. at 7–14.) Smith argues that: (1) NARA has not met its burden to justify its *Glomar* response under exemption 1 (Pl. Br. at 19–23, 29–39), (2) the *Glomar* response was improper because a letter signed by Clinton recognizing a policy of ambiguity towards Israel's nuclear weapons program has been officially acknowledged (*id.* at 23–39), (3) *in camera* review is necessary to determine whether the requested letter is properly classified (*id.* at 56–57), and (4) the requested letter reveals violations of the AECA, (*id.* at 39–48).

1. NARA has met its burden to justify its *Glomar* response.

An agency may respond to a FOIA request by issuing a *Glomar* response—refusing to confirm or deny the existence of records. A *Glomar* response is "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information . . . ." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). A *Glomar* response is permitted only when confirming or denying the existence of agency records "would itself 'cause harm cognizable under a[] FOIA exception.'" *Id.* (quoting *Wolf*, 473 F.3d at 374). Summary judgment may be based solely on information provided in an agency's supporting declaration if that declaration sufficiently justifies that the existence or not of the sought records falls within a FOIA exemption. *See Wolf*, 473 F.3d at 375; *ACLU*, 628 F.3d at 619.

Here, NARA asserts that its *Glomar* response is proper because exemption 1 applies to the sought records. Exemption 1 permits withholding information that is "specifically authorized under the criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and is "properly classified." 5 U.S.C. § 552(b)(1)(A). NARA argues that the information requested by Smith is properly classified under sections 1.4(b) and (d) of Executive Order 13,526. (Def. Br. at 8–10 (citing Exec. Order No. 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010)).) In support of its *Glomar* response, NARA submitted a declaration from John P. Fitzpatrick, Senior Director, Records Access and Information Security Management Directorate of the National Security Council. (ECF No. 10-3 ("Fitzpatrick Decl.") ¶ 1.) Smith argues that the Fitzpatrick Declaration is inadequate to establish that exemption 1 applies. (Pl. Opp'n at 13.) Smith's arguments are unpersuasive.

*a. NARA's Declaration sufficiently establishes that exemption 1 applies.*

To determine whether NARA's *Glomar* response is justified, the court must consider whether the fact of the existence or non-existence of the requested records falls within exemption 1. *See Roth*, 642 F.3d at 1178. When evaluating whether an agency has properly withheld information under exemption 1 "the only question is whether the disputed document is properly classified under the applicable Executive Order." *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 718 F.3d 899, 904 (D.C. Cir. 2013). Executive Order 13,526 governs proper classification under § 552(b)(1). Exec. Order No. 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010). It requires the following elements for proper classification: 1) an "original classification authority" must classify the information; 2) the information must be "owned by, produced by or for, or [be] under the control of the United States Government"; 3) the information falls under one or more of the eight categories enumerated in § 1.4 of Executive Order 13,526; and 4) an "original classification authority determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" that the authority can identify or describe. *Id.* § 1.1.

First, the Fitzpatrick Declaration establishes—and Smith does not dispute—that Fitzpatrick has proper classification authority pursuant to Executive Order 13,526. (*See* Fitzpatrick Decl. ¶ 2.) Second, information regarding the existence of a presidential letter is "owned" and "produced" by the United States government. Third, the information at issue—an alleged letter from President Clinton communicating to Israel the United States' diplomatic posture on Israel's nuclear development—pertains to sections 1.4(b) and (d) of Executive Order 13,526, as it "could confirm or refute the substance of information exchanged between the United States and one or more foreign governments." (*Id.* ¶ 9.) Thus, the Declaration

establishes that the information withheld satisfies the first three criteria for proper classification under Executive Order 13,526.

Fourth, the Fitzpatrick Declaration also points out that acknowledging the existence of a presidential letter addressed to members of Israel's government regarding the Nuclear Non-Proliferation Treaty would, among other things,

> undermin[e] the foreign relations objectives of the United States by sowing doubt about the U.S. commitment to the Non-Proliferation Treaty . . . eliminating strategic ambiguity (i.e., whether or not an allied foreign state maintains certain capabilities) . . . undermin[e] relations with an important ally by revealing information shared with an expectation of confidentiality; undermin[e] U.S. government policy limiting the potential for an arms race in a particular region; serv[e] as confirmation for adversaries that there is no such information; undermin[e] relations with other nations by suggesting differential treatment; and reveal[] the relationship (or absence of such a relationship) with foreign intelligence agencies.

(*Id.* ¶ 10.) Fitzpatrick further states that acknowledging whether such a letter exists "could reveal the United States' regional interests, and relationships" and allow the country's adversaries to "exploit this information to gain a more accurate picture of the U.S. Government's activities and interests, which would impair the effectiveness of the President's foreign policy." (*Id.*)

Fitzpatrick's lengthy summary of the harmful national security consequences of acknowledging the letter satisfies the final requirement for classification under Executive Order 13,526. *See Competitive Enter. Inst. v. U.S. Dep't of Treasury*, 319 F. Supp. 3d 410, 419 (D.D.C. 2019) ("[T]he disclosure of information that may impact future negotiations between the United States and foreign nations, or that may damage the United States' ability to speak candidly with or about foreign nations[] poses sufficient potential harm to 'foreign relations' to justify classification under EO 13,526 and nondisclosure under Exemption 1." (citing *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 306 F. Supp. 2d 58, 65–66 (D.D.C. 2004)).

The detail in the Fitzpatrick Declaration is enough to support a *Glomar* response. *See, e.g., Baez v. U.S. Dep't of Justice*, 647 F.2d 1328, 1336–37 (D.C. Cir. 1980) (affidavit stating that producing documents would reveal cooperation with foreign intelligence service was sufficient to affirm summary judgement for the agency); *Frugone v. CIA*, 169 F.3d 772, 774–75 (D.C. Cir. 1999) (CIA affidavit stating disclosure would increase tensions between the United States and a foreign sovereign sufficiently supported *Glomar* response); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 164 (D.D.C. 2004) (citing *Pub. Citizen v. U.S. Dep't of State*, 276 F.3d 634 (D.C. Cir. 2002) (agency's explanation that disclosing information could enable foreign adversaries to identify U.S. intelligence activities, sources, or methods was enough to support summary judgment). "[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified," *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007), and the Fitzpatrick Declaration provides such an assertion.

Because the Fitzpatrick Declaration logically and plausibly supports NARA's conclusion "that acknowledging the mere existence of the responsive records would disclose exempt information," *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d at 931, NARA has met its burden of showing that exemption 1 protects the information sought from disclosure.

      b. *Smith fails to show that NARA acted in bad faith.*

Smith also argues that the Fitzpatrick Declaration is tainted by bad faith. (Pl. Br. at 29–39.) This claim, too, is unavailing.

An affidavit that is otherwise adequate may be "controverted . . . by evidence of agency bad faith." *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1982). But the presumption of good faith accorded to

agency affidavits "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). Smith can show bad faith by demonstrating that "the record raises substantial doubts regarding the agency's efforts." *Elec. Privacy Info. Co. v. U.S. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 107 (D.D.C. 2005).

Most of Smith's bad faith argument consists of speculative and unsubstantiated allegations that the information contained in the Fitzpatrick Declaration is inaccurate and misleading. For instance, Smith suggests that the letters are "probably not classified," (Pl. Br. at 31), and that parts of the Declaration are suspicious because they are "boilerplate from another FOIA request," (*id.* at 37). He also argues that revealing the existence of the letter he seeks would not disclose classified information because the government has previously released facts involving the United States' policy of ambiguity towards Israel's nuclear weapons program. (*Id.* at 31.) But, as discussed below, Smith points to no facts indicating that the document he seeks— a letter from President Clinton embracing such a policy—has been officially acknowledged, such that NARA would be acting in bad faith by declining to confirm or deny its existence. Because Smith has "presented no actual evidence refuting any statements" in the Declaration, *Voinche v. FBI*, 412 F. Supp. 2d 60, 72 (D.D.C. 2006), he has failed to raise "substantial doubts" that NARA acted in good faith. *Elec. Privacy Info. Co. v. U.S. Dep't of Homeland Sec.*, 384 F. Supp. 2d at 107.

Smith also argues that Fitzpatrick lacks credibility as a declarant because he did not disclose that he is a former NARA employee. (Pl. Br. at 29.) But that nondisclosure is not material to the credibility of his statements. As with his other bad faith claims, Smith's

13

allegation that Fitzpatrick is inherently biased because of his prior employment is entirely speculative and not substantiated by any "actual evidence." *Voinche*, 412 F. Supp. 2d at 72.

In sum, Smith has failed to rebut the presumption of good faith that the court accords to the otherwise satisfactory Fitzpatrick Declaration. Accordingly, this court finds that NARA is entitled to summary judgment on whether it properly issued a *Glomar* response under exemption 1.

    2. <u>Smith fails to show that the alleged Clinton letter has been officially acknowledged.</u>

A plaintiff may overcome an otherwise valid *Glomar* response by showing that the agency has publicly and officially acknowledged the sought records. *See Am. Civ. Liberties Union v. CIA*, 710 F.3d 422, 426–27 (D.C. Cir. 2013). In *Glomar* cases, "if prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information." *Wolf*, 473 F.3d at 379. The court must analyze only whether the prior disclosure acknowledges the existence of the records sought, not whether the content of the records has been disclosed. *See Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1081 (D.C. Cir. 2012).

Smith argues that NARA's *Glomar* response was improper because there has been official acknowledgment of the "longstanding, coerced U.S. policy of 'ambiguity' towards Israel's nuclear weapons program." (Pl. Br. at 20.) To support this argument, he points to a 1969 memorandum from Henry Kissinger to President Nixon, remarks by President Obama in 2010, and an article in *The New Yorker* on United States-Israel nuclear policy, each of which, he contends, constitutes an official acknowledgment that President Clinton signed a letter recognizing the U.S. policy of ambiguity. (*Id.* at 22–27.)

14

a. *The Kissinger Memorandum*

Smith first contends that a July 1969 memorandum from Henry Kissinger to President Nixon is sufficiently similar to the requested information to satisfy the official acknowledgment requirement. (Pl. Br. at 24–26.) The memorandum, titled "Critical Technology Assessment in Israel and NATO Nations," outlines the parameters of the United States' ambiguity towards Israel's nuclear capabilities, but does not refer to any presidential letters on the topic. (*See* ECF No. 11-5.)

While the Kissinger memorandum sheds light on the United States' foreign policy concerns related to Israel's nuclear capacity in 1969, the memorandum does not—and could not—show that President Clinton wrote a letter more than two decades later. Because the information in the Kissinger memorandum does not "necessarily match" the information at issue—the existence of the Clinton letter—the memorandum does not establish the existence of records responsive to Smith's FOIA request. *See Wolf*, 473 F.3d at 379.

b. *President Obama's statement*

Next, Smith points to a July 2010 speech by President Obama, during which he stated that he and Israeli Prime Minister Benjamin Netanyahu had "discussed issues that arose out of the [July 2010] nuclear nonproliferation conference" and remarked that he had "reiterated to the Prime Minister that there is no change in U.S. policy when it comes to these issues." (Pl. Br. at 26–27.) With these statements, Smith argues, President Obama "publicly verified" the contents of a letter reflecting the policy of ambiguity towards Israel's nuclear weapons program. (*Id.*) Smith then argues that because President Obama's alleged letter renewed the policy and he publicly recognized the policy, President Clinton's letter regarding the same policy has been officially acknowledged. (*Id.*)

Publicly recognizing a certain foreign policy approach is not the same as acknowledging a specific letter officially committing the United States to that policy. *Cf. Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 57 (D.D.C. 2015) (finding that general statements that "the intelligence community . . . is looking at phone numbers and durations of calls" cannot be extrapolated to be an official acknowledgment that the intelligence community had data records for specific persons' phone accounts). President Obama's statement regarding United States policy on nuclear non-proliferation issues does not confirm that President Clinton had previously signed a letter recognizing the same policy, as Smith alleges. Thus, President Obama's 2010 remarks do not "necessarily match" Smith's requested letter and fail to qualify as an official acknowledgement that the document sought exists. *See Wolf*, 473 F.3d at 379.

        c.   <u>*The New Yorker* article</u>

Finally, Smith suggests that an article from *The New Yorker* on U.S.-Israeli nuclear policy counts as an official acknowledgement that the letter he seeks from the Clinton Library exists, because the article, relying on information from unnamed government sources, reported that President Clinton signed a secret letter reaffirming the U.S. policy of ambiguity towards Israel's nuclear arsenal. (Pl. Br. at 22. (citing Adam Entous, *How Trump and Three Other US Presidents Protected Israel's Worst-Kept Secret*, The New Yorker, June 18, 2018).)

*The New Yorker* article does not amount to an official acknowledgment. A disclosure is not "official" when it is "made by someone other than the agency from which the information is being sought." *Frugone*, 169 F.3d at 774. "[S]peculation by the press—no matter how widespread—and disclosures in the press from unnamed sources are not sufficient to waive an agency's right to withhold information under FOIA." *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d at 59; *see also Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) ("It is one thing

16

for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)). Thus, *The New Yorker* article, which relies on information from unnamed sources, does not establish that the alleged letters "already have been made public through an official and documented disclosure." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).

Because neither the Kissinger memorandum nor President Obama's 2010 remarks "necessarily match" the information that Smith requests, and *The New Yorker* article is not an official disclosure, Smith fails to show any official acknowledgement of an Israel nuclear letter signed by President Clinton. Accordingly, this court finds that NARA is entitled to summary judgment on whether it is precluded from invoking exemption 1 because of an official acknowledgment.

3. *In camera* review is not warranted.

In challenging the classification of the information he seeks, Smith argues that NARA improperly failed to search for the letters requested and asks the court to examine the alleged letters to determine whether they bear original classification markings. (Pl. Br. at 53–57.) But "to issue a *Glomar* response, an agency need not create or maintain any tangible records." *Mobley v. CIA*, 924 F. Supp. 2d 24, 49 (D.D.C. 2013). A *Glomar* response relates to the existence or non-existence of records, therefore ordering an agency to search for responsive records or to produce original classification markings in support of its response would undermine the purpose of *Glomar*. *See People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014). Because the Fitzpatrick Declaration is sufficient to support NARA's

17

*Glomar* response, the agency need not conduct a search for any responsive records nor submit them for *in camera* review.

  4. <u>Smith has not adequately shown concealment of violations of the law.</u>

Section 1.7 of Executive Order 13,526 bars classifying information in order to conceal violations of the law. Exec. Order 13,526 § 1.7(1), 75 Fed. Reg. 707 (Jan. 5, 2010). A plaintiff alleging that an agency has classified information to conceal a violation of law "must provide something more than conjecture to show that the agency's withholding decision violates Executive Order 13,526." *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96–97 (D.D.C. 2017). Credible evidence is required. *See Canning v. U.S. Dep't of Just.*, 848 F. Supp. 1037, 1047–48 (D.D.C. 1994) (rejecting plaintiff's challenge where plaintiff presented claims "based primarily on speculation" and failed to present "credible evidence that the agency's motives for its withholding decisions were improper or otherwise in violation of E.O. 12356").[3]

Under the AECA, 22 U.S.C. § 2799aa, "no funds made available to carry out the Foreign Assistance Act of 1961" or other provisions of the AECA "may be used for the purpose of providing" economic or military assistance to "any country which the President determines" to be engaged in nuclear weaponry. 22 U.S.C. § 2799aa-1(a)(1).

Smith argues that United States aid to Israel violates the AECA because it is public knowledge that Israel has a nuclear weapons program. (Pl. Br. at 44–46.) Smith further argues that the alleged letter sought in his FOIA request is evidence of these violations of the AECA. But the AECA only bars foreign aid to countries that the President has determined to be delivering or amassing nuclear reprocessing equipment, materials, or technology. 22 U.S.C.

---

[3] Executive Order 13,526, signed by President Obama on December 29, 2009, was previously Executive Order 12,356, signed by President Reagan on April 2, 1982. Exec. Order No. 12,356, 47 Fed. Reg. 14874 (1982).

§ 2799aa-1(a)(1).  Smith has not shown that the President has found Israel to be engaging in such activity, and he lacks standing to compel such a determination.  *See Smith v. United States*, 715 F. App'x 10, 10 (D.C. Cir. 2018) ("The district court correctly concluded that appellant lacked standing to seek a writ of mandamus directing the President to determine, pursuant to the Arms Export Control Act of 1961, 22 U.S.C. § 2799aa-1, whether Israel has engaged in certain conduct related to the development of nuclear weapons.").

The court therefore cannot find that NARA withheld the alleged letter in order to conceal violations of law.

### IV. CONCLUSION

For the foregoing reasons, NARA's motion for summary judgment is GRANTED and Smith's cross-motion for summary judgment is DENIED.

A corresponding Order will issue separately.

Date:  November 27, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge